PT:AAS/RP
F. #2015R01180

**16M712**

**16-712**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - -X

UNITED STATES OF AMERICA

- against -

CARLOS BECKER,

        Defendant.

- - - - - - - - - - - - -X

**TO BE FILED UNDER SEAL**

COMPLAINT AND AFFIDAVIT IN
SUPPORT OF ARREST WARRANT

(18 U.S.C. §§ 844(h)(1) and 1349)

EASTERN DISTRICT OF NEW YORK, SS:

      JASON WAKE, being duly sworn, deposes and states that he is a Special Agent with the Federal Bureau of Investigation, duly appointed according to law and acting as such.

      In or about and between September 2012 and September 2015, within the Eastern District of New York and elsewhere, the defendant CARLOS BECKER, together with others, did knowingly and intentionally conspire to devise a scheme and artifice to defraud GEICO Insurance ("GEICO"), and to obtain money and property from GEICO by means of materially false and fraudulent pretenses, representations and promises, and for the purpose of executing such scheme and artifice, to place and to cause to be placed in a post office and authorized depository for mail matter, one or more matters and things to be sent and delivered by the United States Postal Service, to wit: envelopes containing reimbursement checks, contrary to Title 18, United States Code, Section 1341.

      (Title 18, United States Code, Section 1349)

On or about September 7, 2012, within the Eastern District of New York, the defendant Carlos Becker, together with others, did knowingly and intentionally use fire and an explosive to commit a felony which may be prosecuted in a court of the United States, to wit: conspiracy to commit mail fraud, in violation of Title 18, United States Code, Section 1341.

(Title 18, United States Code, Section 844(h)(1))

The source of your deponent's information and the grounds for his belief are as follows:[1]

1.   I am a Special Agent with the Federal Bureau of Investigation ("FBI"), and have been so employed since 2014. I am presently assigned to a squad at the New York Field Office, where my duties include the investigation of cases involving the theft of funds through fraudulent means. I am familiar with the facts and circumstances set forth below from my participation in the investigation; my review of the investigative file, including my review of audio recordings and transcripts; and from reports prepared by other law enforcement officers involved in the investigation.

I.   The Defendant

2.   The defendant CARLOS BECKER resides in Nassau County, New York. BECKER is employed as an officer by the New York City Police Department ("NYPD").

---

[1] Because the purpose of this Complaint is to set forth only those facts necessary to establish probable cause to arrest, I have not described all the relevant facts and circumstances of which I am aware.

## II.   GEICO

3.   GEICO is a corporation with headquarters in Chevy Chase, Maryland. GEICO provides private passenger automobile insurance, among other insurance services, to the public.

4.   A customer who insures his or her automobile through GEICO may report a claim for damage to the vehicle insured by GEICO through the GEICO website or by calling a GEICO toll-free telephone number. A claims representative from GEICO then speaks directly to the customer by telephone, schedules an inspection of the vehicle, and provides an estimate of repair costs. In the case of a destroyed vehicle, GEICO provides the customer with money for a replacement vehicle. GEICO pays such claims for repair costs or replacement costs by sending the insured customer a check through the United States mail.

## III.  The Range Rover

5.   On or about September 7, 2012, at approximately 1:48 a.m., NYPD dispatchers received a 911 call reporting a burning vehicle in the vicinity of 139th Avenue and 231st Street in Queens. Members of law enforcement reported to the scene and discovered a gray 2008 Range Rover Sport (the "Range Rover") with multiple broken windows, and which was on fire. The Range Rover was registered to BECKER and insured by GEICO.

6.   According to toll records for a cellular telephone subscribed to in BECKER's name (the "Becker Phone"), on or about September 7, 2012 at 8:07 p.m., the Becker Phone called a GEICO toll free number in a call lasting 11 seconds. Later that evening, at approximately 10:08 p.m., the Becker Phone called the same GEICO toll free number in a

4

call lasting 10 minutes and 55 seconds. According to GEICO records, BECKER reported that the Range Rover was missing during the second call.

7. On September 8, 2012 at 8:21 a.m., BECKER reported the Range Rover as stolen to the Nassau County Police Department ("NCPD"). According to police reports, BECKER told the NCPD that the Range Rover had been removed by persons unknown without his consent and he requested the arrest of the responsible party.

8. On or about September 10, 2012, BECKER participated in a consensually-recorded interview with a GEICO insurance claim representative. During the interview, BECKER claimed that he had first noticed that the Range Rover was missing from its parking spot in front of his house early on the morning of September 7, 2012, and assumed at that time that the Range Rover had been towed due to unpaid parking tickets. BECKER claimed that after confirming with the NCPD that the Range Rover had not been towed due to unpaid tickets, he then reported the vehicle as stolen. At the conclusion of the interview, BECKER stated that the information provided during the interview was true and to the best of his knowledge.

9. On or about September 25, 2012, BECKER submitted to GEICO a notarized claim regarding the theft of the Range Rover. At the bottom of the notarized claim form, BECKER signed his name and swore that the information contained therein was true and correct to the best of his knowledge. In pertinent part, BECKER described his usage of the Range Rover during the 24 hours prior to the theft as follows: "Went out to the store and then came back home."

10. On or about September 10, 2012 and November 9, 2012, BECKER was examined under oath by GEICO investigators regarding the theft of the Range Rover. I have reviewed transcripts of those examinations. During the examinations, BECKER testified he had not initially reported the Range Rover as stolen before he went to work on September 7, 2012 because he believed that the Range Rover might have been towed. BECKER further testified that, while returning home from work, he had called the NCPD to report the Range Rover as missing and also called GEICO to make a claim for the Range Rover. When asked how he already knew that the Range Rover was stolen while driving home from work, BECKER stated that he "never heard of any issues of towing in Nassau County."

11. During the examinations under oath, BECKER also testified that he was in possession of the sole key for the Range Rover and that he had never made a duplicate key. BECKER further testified that at the time the Range Rover was purportedly stolen, the Range Rover was parked outside his residence, the key was not inside the vehicle, the Range Rover could not be started remotely, the Range Rover was locked and the alarm was set.

12. During the course of the investigation, law enforcement officials have spoken with a representative with Jaguar Land Rover's[2] vehicle security engineering group. The representative has advised that entry into the Range Rover without a manufacturer-programmed key is not possible and that the alarm will be triggered if attempts are made to enter the vehicle without an authorized key. The representative has further advised that a manufacturer-programmed key must be used to start the vehicle and that to

---

[2]   Jaguar Land Rover manufactured the Range Rover.

6

prevent vehicle theft using unauthorized duplicate keys the manufacturer-programmed keys are encrypted to prevent them from being successfully copied.[3] Accordingly, it would have been impossible for the Range Rover to have been stolen without BECKER first providing the alleged thief with the key to the vehicle.

13. On or about January 4, 2013, GEICO issued two checks in the amounts of $29,480.86 and $4,780.33, to satisfy BECKER's claim for the Range Rover. I have been informed by a GEICO representative that GEICO sent the check in the amount of $4,780.33 to BECKER at his address in Nassau County, New York, through the United States Postal Service from GEICO's processing center in Fredericksburg, Virginia. Bank records reflect that BECKER deposited this check in his personal bank account on or about January 8, 2013.[4]

14. The investigation has revealed that the Range Rover was not stolen, but rather that BECKER enlisted the help of others to dispose of the Range Rover in order to present a false insurance claim to GEICO. In particular, a co-conspirator ("CC1")[5] has informed law enforcement authorities that BECKER initially retained CC1 to crash the Range

---

[3] The keys contain transponder key codes that have more than one million possible coding combinations.

[4] The GEICO check in the amount of $29,480.46 was issued to Hudson Valley Federal Credit Union, which is the financial institution through which Becker financed his purchase of the Ranger Rover.

[5] CC1 has admitted to law enforcement that he and a second co-conspirator ("CC2") set fire at BECKER's direction, so BECKER could collect the insurance proceeds on the Range Rover. The information that CC1 has provided has been corroborated by, among other things, cellular telephone records, consensual recordings that he made of BECKER and CC2, BECKER's statements to law enforcement and GEICO, and information provided to law enforcement officials by other witnesses.

Rover so that BECKER could present a fraudulent insurance claim. BECKER agreed to pay CC1 for these services. According to CC1, CC1 was unable to crash the Range Rover because of a steering malfunction and called BECKER to ask whether BECKER wanted the Range Rover burned instead. BECKER then instructed CC1 to burn the Range Rover. Thereafter, CC1 poured gasoline inside the Range Rover and lit the gasoline on fire, but accidentally extinguished the flame by closing the doors of the Range Rover. Subsequently, CC2, who had been recruited by CC1, successfully helped set the Range Rover on fire. CC1 then called BECKER to inform BECKER that the Range Rover was burned. According to CC1, BECKER never paid CC1 for burning the Range Rover.

15. Subscriber records for the Becker Phone and a cellular telephone used by CC1 (the "CC1 Phone")[6] corroborate the information provided by CC1. Early in the morning of September 7, 2012, the following calls between the Becker Phone and CC1's phone took place:

| Time of call | From | To | Call duration |
| --- | --- | --- | --- |
| 1:00 a.m. | CC1 PHONE | BECKER PHONE | 1' 19" |
| 1:04 a.m. | BECKER PHONE | CC1 | 0' 26" |
| 1:12 a.m. | BECKER PHONE | CC1 | 0' 45" |
| 1:50 a.m. | CC1 PHONE | BECKER PHONE | 0' 35" |

---

[6] CC1 admitted that he used the CC1 Phone to call Becker the morning of September 7, 2012. In addition, prior to September 7, 2012, CC1 had regularly indicated in documents obtained by law enforcement that the CC1 Phone was his cellular telephone.

As noted above, the 911 call reporting the burning Range Rover occurred at 1:48 a.m. on September 7, 2012 – two minutes before a call between the CC1 Phone and the Becker Phone.

16. Also in or about September 2014, CC1, while acting at the direction of law enforcement, met CC2. During this meeting, CC1 was equipped with a hidden recording device provided by law enforcement. I have reviewed a draft transcript of the recording and verified the citations below for accuracy. During the conversation, CC2 repeatedly admitted that he had burned the Range Rover, making the following statements, among others: ("Arson. Do you know what they'll give me for arson?") ("You didn't throw the match. I did.") ("I threw the match and it went 'poof' and you closed the door.") ("And then that's when I said [unintelligible] because I burned my eyelashes.") and complained that he had not yet received payment from BECKER. In pertinent part, CC2 stated that he had recently visited BECKER's residence and unsuccessfully attempted to procure payment from BECKER.

17. In addition, in or about February 2015, CC1, acting at the direction of law enforcement, met with BECKER. During this meeting, CC1 was again equipped with a recording device provided by law enforcement. Below is a draft transcript of portions of the recording, which I have reviewed for accuracy:

> CC1: And I know, I'm telling you Carlos, as soon as I cop out to that case,[7] they gonna' come and question [you and your sister[8]]. I know it. And my lawyer knows it too and she's like "yeah they're gonna definitely question them." And she advised me, you know, "don't even say nothing to them, you

---

[7] CC1 was referring to an unrelated state assault charge.

[8] BECKER lives with his sister, who was an acquaintance of CC1.

|  |  |
|---|---|
|  | know? Don't say nothing to them, you know? Let them do what they're gonna do." But at this point I'm trying to help you out, you know what I'm sayin'? |
| BECKER: | Yeah. |
| CC1: | Because I don't know, you say the wrong thing and it's not gonna jive. |
| BECKER: | I'm not saying anything. |
| CC1: | You know, if the wrong thing is said . . . |
| BECKER: | I'm not saying anything. |
| CC1: | it's not gonna jive, you know? |
| BECKER: | I'm not saying anything. |
| CC1: | She can be like I stole your car key or something like that, you know. |
| BECKER: | I told her . . . |
| CC1: | But you know, I'm simply letting you know they're gonna definitely be … |
| BECKER: | Yeah, I'm not gonna do it because you know for you it's gonna be . . . |
| CC1: | It's gonna be too late for me. |
| BECKER: | Yeah. |
| CC1: | It's gonna be too late for me. I'm talkin' about for you. It's gonna be too late for me. They can't do shit to me. I'm coppin' out. You know what I'm sayin'? I'm coppin' out to grand theft auto. |
| BECKER: | Yeah. |

| | |
|---|---|
| CC1: | And with me coppin' out I gotta let them know that [CC2] burned the car. |
| BECKER: | Yeah. |
| CC1: | You understand what I'm sayin'? |
| BECKER: | Yeah. |
| CC1: | And him I don't give a fuck about – |
| BECKER: | Yeah. |
| CC1: | – but you I do. |
| BECKER: | Yeah. |
| CC1: | You know what I'm sayin'? So, I mean you two gotta come up with your story. |
| BECKER: | Yeah, yeah, yeah, yeah. |
| CC1: | You know what I'm sayin'? That's what's most important. You gotta come up with your story. And she gotta come up with her story. You understand what I'm sayin'? |
| BECKER: | I'm gonna be like I don't know nothin'. |
| CC1: | Well you're not supposed to know nothin' but you gotta make sure that your sister knows exactly what to say. You need to make sure that she needs to know exactly what to say. |
| BECKER: | Yeah. |
| CC1: | You have to make sure that she knows what to say, you know what I'm sayin'? |
| BECKER: | She ain't gonna be here. She gonna be in Jersey. |
| CC1: | Wherever she's gonna be they're gonna question her, man. Once I cop out to I took your fuckin' car |

|          |   |
|----------|---|
|          | and [CC2] burned it.  Because Carlos you already know that they know the whole fuckin' story, you know what I'm saying.  They know the truth already. |
| BECKER:  | Yeah. |

\* \* \*

|          |   |
|----------|---|
| CC1:     | I have to fuckin' tell them that fuckin' I made CC2 burn the car.  You understand what I'm sayin? And CC2 burned the car.  I got to tell them that. I ain't got no choice.  I got to tell them that.  They interested in the arson.  And, I'm gonna disclose... |
| BECKER:  | Yeah. |
| CC1:     | – yeah, I stole the fuckin' car and I had him burn the car.  I'm gonna simply tell them that after you gave me the car, I mean after I got the fuckin' car, I hit something with the car so I didn't want to bring the car back to you because I hit something and I stole the car from the beginning.  You know what I'm sayin'?  And if they really check, they would see because I told you what happened I hit the fuckin' thing and the fuckin' wheel broke and that's the only reason why I had to burn it.  You know what I'm sayin'?  So, I'm just gonna say, I hit something, I didn't get permission from him to take the car.  I snuck the car, figuring I put the car back... |
| BECKER:  | Yeah. |
| CC1:     | – you know what I'm sayin'?  I put the car back and nobody would know, you know? |
| BECKER:  | Yeah. |
| CC1:     | You know?  That's what I'm gonna tell them. |
| BECKER:  | Yeah. |

## OTHER VEHICLES

18. According to CC1, the Range Rover is not the only vehicle that CC1 has damaged so BECKER could present a fraudulent insurance claim. CC1 reported that, around the same time he and CC2 burned the Range Rover at BECKER's direction, he crashed an Audi sedan belonging to BECKER's sister so BECKER could seek reimbursement from an insurance company. In fact, according to GEICO records, BECKER's sister presented a claim for a collision involving an Audi sedan that occurred on or about September 11, 2012.

19. More recently, in or about September 2015, BECKER submitted another claim to GEICO for a BMW sedan (the "BMW") whose battery purportedly caught fire while being driven by BECKER. A fire marshal with the New York City Fire Department has inspected the BMW and opined that the fire was likely the result of arson, because it appeared that a flammable liquid had pooled in the spare tire well next to the battery, and no part of the cover for the spare tire appeared to be burned. According to the fire marshal, in the event of a typical fire originating in the car battery, there should not be any sign of flammable liquid in the vicinity of the car battery.[9]

20. Recently, one of BECKER's associates (the "Associate") was interviewed by members of law enforcement concerning the BMW. According to the Associate, BECKER commented, shortly before the BMW set on fire, that he was tired of the BMW and that, if something were to happen to the BMW, he would use the insurance proceeds to purchase another vehicle.

---

[9] In contrast, an inspection of the BMW by GEICO did not find that the fire was the result of arson.

13

WHEREFORE, your deponent respectfully requests that the defendant CARLOS BECKER be dealt with according to law. I further request that this affidavit and the arrest warrant be filed under seal as disclosure of this application would give the targets of the investigation an opportunity to destroy evidence, harm or threaten victims or other witnesses, change patterns of behavior, notify confederates, and flee from or evade prosecution.

_____
JASON WAKE
Special Agent
Federal Bureau of Investigation

Sworn to before me this
1st day of August, 2016

THE HONOR
UNITED STA   S/6o1d    E
EASTERN DI